<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BONNIE LOU B., <br><br> Plaintiff, <br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Civil Action No. 3:21-cv-18157 <br><br> **OPINION** |

<u>CASTNER, District Judge</u>

**THIS MATTER** comes before the Court upon Bonnie Lou B.'s ("Plaintiff" or "Claimant") appeal from the final decision of the Commissioner of the Social Security Administration ("Defendant" or the "Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. The Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g) and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, and for good cause shown, the Court affirms the Commissioner's decision to deny Plaintiff social security benefits.

## I.      BACKGROUND

The Court assumes that the parties are familiar with the factual and procedural background of this case, as described at great length in this Court's Opinion on August 3, 2020, and will only recite further facts as necessary for the resolution of the instant appeal before the Court. (Opinion, ECF No. 14, Civ. No. 3:19-17386.)

1

### A.       Procedural History

Plaintiff filled an application for DIB in the fall of 2015, alleging disability since June 15, 2009 due to a dementia diagnosis.   (Administrative Record ("AR") 175-181, ECF No. 4.) Plaintiff's application was initially denied and was denied again on reconsideration. (*Id.* 112-116, 119-121.)   Plaintiff then requested a hearing to review her application, and a hearing was held before an Administrative Law Judge ("ALJ") on April 13, 2018.   (*Id.* 35-96.)   The ALJ issued a decision on June 27, 2018, denying Plaintiff's application.   (AR 17-31.)   Plaintiff then sought review by the Appeals Council, which concluded that there were no grounds for review.   (AR 1-6.)

Plaintiff filed suit appealing that decision to the District Court on August 29, 2019. (Compl., ECF No. 1, Civ. No. 19-17386.)   The Court issued an Opinion remanding the matter back to the ALJ for further consideration.   (Opinion, ECF No. 14, Civ. No. 3:19-17386.)   The Court, in its decision, noted that "[a]lthough Plaintiff had begun experiencing symptoms of Early-Onset Alzheimer's Disease by June 15, 2009, Plaintiff was first screened for mental impairment in April 2015, as part of her and her husband's application to become a resource family for foster parents." (*Id.* 2.)   The Court then analyzed the medical evidence, noting that after testing, Plaintiff attended a neurology consultation in May 2015 where she was diagnosed with "an anxiety disorder, depression, and mild cognitive impairment with memory loss."   (*Id.* 3.)   Plaintiff was then recommended to undergo "neurocognitive and psychiatric evaluations," which occurred in October of 2015.   (*Id.*)   At that time, Dr. Karen Tennyson "concluded that Plaintiff showed severe memory deficits with cognitive defects, and diagnosed Plaintiff with dementia, not otherwise specified, and an adjustment reaction with mixed emotional features."   (*Id.* 4.)   Further, "Dr. Tennyson noted that there appeared to have been a progressive decline in Plaintiff's abilities

beginning as early as 2007 to 2009, but that neither Plaintiff nor her husband were good historians in recording the course of her symptoms." (*Id.*) Finally, Plaintiff consulted with "geriatric specialist Dr. John Waters in December 2016." (*Id.*) He concluded that "Early-Onset Alzheimer's Type Dementia was a likely diagnosis consistent with Plaintiff's previous neuropsychological testing." (*Id.*)

The Court then reviewed the Testimonial Record, documenting the description of Plaintiff's mental and emotional decline as provided by David P., Plaintiff's husband. (*Id.* 5.) The Court noted that David P. stated that Plaintiff's mental decline may have begun as early as 2000. (*Id.*) Further, David P. noted that Plaintiff began having difficulty with tasks at home, difficulty with directions and multi-tasking, lost interest in many household activities, and other examples to evidence Plaintiff's mental decline. (*Id.* 5-6.)

Further, the Court considered the information provided by Mary T. ("Mary T."), who worked with Plaintiff. (*Id.* 6.) Mary T. described difficulty training Plaintiff because she had trouble grasping new tasks, difficulty with instructions, a lack of cognitive ability, and displayed extraordinary forgetfulness in the workplace. (*Id.* 6-7.) The Court also recounted the testimony provided by Plaintiff's friend and paralegal Amanda M. ("Amanda M."). (*Id.* 7.) Amanda M. noted that Plaintiff would repeat herself often, would "repeat something over the course of an evening as if she was saying it for the first time," forgot she was served with, and signed, a foreclosure complaint and subsequent judgment, and other examples of unusual forgetfulness and cognitive decline. (*Id.* 7-8.)

After explaining the ALJ's decision and the appropriate standard of review, the Court's Opinion remanded the matter back to the ALJ. (*Id.* 8-13, 25.) The Court concluded that the ALJ did not justify the weight assigned to the provided medical evidence and lay testimony sufficiently

and remanded the matter on this basis. (*Id.* 14-20.) In that analysis, the Court noted that Plaintiff's arguments that "the ALJ improperly relied upon flawed findings by state agency psychologists Dr. Umpierre and Dr. Foley" were unpersuasive because the ALJ in fact gave the findings of these two medical professionals little weight and based the decision on other medical and testimonial evidence. (*Id.* 14.) The Court also concluded that the ALJ did not adequately explain why only partial weight was lent to the medical opinion of Dr. Tennyson who opined that Plaintiff's total inability to function in the workplace began well before 2013, especially considering that Dr. Tennyson's opinion appears to have been "consistent with other evidence showing that symptoms of dementia and worsening of cognitive functions had appeared as early as 2009." (*Id.* 17.) The Court then remanded the matter "for further consideration of the weight to be accorded to the opinion of treating physician Dr. Tennyson, as well as a determination of Plaintiff's residual functional capacity based on the appropriately weighed medical evidence." (*Id.* 18.) Similarly, the Court concluded that the ALJ failed to sufficiently justify why significant weight was not lent to the lay testimony of Mary T. and Amanda M. (*Id.* 19.) The Court noted that the lack of explanation is particularly important because of the nature and timeliness of their relationships with Plaintiff. (*Id.*) Especially in light of the lay evidence not being cumulative of other evidence, and in fact potentially being "at odds with the ALJ's residual functional capacity determination that Plaintiff could make 'simple work-related decisions based on established standards and instructions,'" the Court concluded that remand was appropriate for reconsideration of the weight placed on the testimony of the medical professionals and the lay witnesses, and to reassess Plaintiff's residual functional capacity ("RFC"). (*Id.* 20.)

The Court then rejected Plaintiff's argument that that the ALJ improperly relied on testimony regarding Plaintiff's continued ability to engage in self-care and perform daily activities.

(*Id.* 21.)  The Court concluded that "Plaintiff has not offered any precedential authority in support of her argument that an ALJ cannot consider evidence of a claimant's ability to self-care and perform daily activities." (*Id.*)  The Court concluded that the ALJ did not err by relying on David P.'s testimony about Plaintiff's ability to "perform daily activities and self-care," especially in light of the ALJ's decision to "not to give 'significant weight' to his statements regarding Plaintiff's activities such as cooking, shopping, and socializing. . . . The ALJ recognized that David P.'s testimony was not determinative because he was 'not medically trained to make exacting observations,' and because he had not accurately recorded the course of Plaintiff's symptoms." (*Id.* 22) (quoting First ALJ Opinion, AR 28.)

Finally, the Court rejected Plaintiff's argument that the "ALJ committed reversible error by failing to hear Plaintiff's case in accordance with the Social Security Administration (SSA)'s Compassionate Allowance (CAL) system, which provides an expedited process for claimants with critical illnesses." (*Id.* 23.)  The Court held that "Plaintiff has offered no arguments why the failure to consider the CAL process would have prejudiced her claim, or that the result could have been different." (*Id.* 24.)

Ultimately, as mentioned above, the Court remanded the case back to the ALJ for further consideration regarding the weight assigned to lay testimony and medical evidence.  (*Id.* 25.)

### B.    ALJ's Second Opinion

On remand, a second hearing was held via telephone on May 25, 2021.  (AR 370-390.) Plaintiff and her husband were both present, although they did not testify at the second hearing. (*Id.*)  Medical expert Dr. Justin Willer was also present as a medical expert and provided testimony about the severity of Plaintiff's impairments.  (*Id.*)  A second decision was issued on June 18, 2021, again denying Plaintiff's application for DIB.  (*Id.* 348-360.)

On remand, the ALJ determined that Plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2013," and must establish disability on or before that date to be entitled to a period of disability benefits. (*Id.* 349.)  The ALJ then set forth the Social Security Administration's five-step sequential process for determining whether an individual is disabled, and ultimately concluded Plaintiff was not disabled from June 15, 2009, through the date last insured. (*Id.* 349-350.)

First, the ALJ found that "[t]he claimant last met the insured status requirements of the Social Security Act on December 31, 2013." (*Id.* 350.)  Second the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 15, 2009, the alleged onset date, through December 31, 2013, and noted that there were no earnings after 2009. (*Id.*)  Third, the ALJ determined that "the claimant had the following medically determinable impairment: Alzheimer's disease." (*Id.*)

Next the ALJ concluded that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments." (*Id.* 351.)  In making this conclusion, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and specifically noted that the District Court's Opinion and Order directed the ALJ to give further consideration to the opinions and statements of Dr. Tennyson and the lay person testimony provided by Amanda M. and Mary T. (*Id.*)

The ALJ then reviewed Plaintiff's husband's testimony from the first hearing, noting that Plaintiff had her own business with its own location for fifteen (15) years. (*Id.* 352.)  Then,

Plaintiff and her husband merged their respective businesses into one location, with Plaintiff's husband designing kitchen layouts and Plaintiff adding design and decoration elements. (*Id.*) Both Plaintiff and her husband continued to run their business until its close in 2014, although both stopped taking salaries in 2008 due to the economic crash. (*Id.*) Plaintiff's husband described her struggles with running the business and her mental decline during that time. (*Id.*)

> The claimant's husband testified that the claimant attempted to perform work previously performed by the roles of controller and human resources management. Part of this work included performing audits, however, the claimant was not retaining the knowledge necessary for this process. He reported that other workers reported that the claimant could not comprehend or remember details. At the time, he attributed this to stress, or simply lack of training. The claimant worked in the role of administrator, as well as personnel manager, and she conducted reviews and liability insurance audits with the assistance of a controller who stayed on part-time. Her husband testified the claimant was then (between 2008 and 2014) working between 20 and 80 hours per week, depending on whether audits were coming in. He stated she would regularly work extra time to get up to speed. He testified she was performing the necessary work in these areas, but not at the level of someone who was experienced in such work. During this time period, he noticed the claimant had difficulty with directions and multitasking. He reported she was angry a lot with herself at her inability to do things she used to do. He described that the claimant's reaction time was slowing, and their children no longer wanted to be in the car with her. He stated they applied to become Resource Parents for children in the foster care system, and the assessment performed as part of that application process is what prompted the claimant's diagnosis in 2015. He testified, however, that she started exhibiting poor judgment as far back as 2000, as regarding finances and their home, and had been showing signs of depression in 2005-2006 (2018 Hearing Testimony).

(*Id.*) The ALJ then reviewed and analyzed the statements of Mary T., documenting Plaintiff's struggles in the workplace and evidence of her mental decline. (*Id.*)

The ALJ then concluded that while "claimant's medically determinable impairment could have reasonably been expected to produce some of the alleged symptoms," Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent for the reasons explained in this decision." (*Id.* 353.) The ALJ determined that Plaintiff's impairments, considered singly and in combination, did not meet either listing 12.02 or listing 11.17, the listings that are considered for Early-Onset Alzheimer's Disease. (*Id.*)

The ALJ then analyzed the medical and opinion testimony, including the testimony of the medical expert, Dr. Willer, who "testified that the retrospective assessments of the claimant by her co-workers and spouse do not necessarily establish the timing of the symptoms or the degree of their severity." (*Id.* 353.) Dr. Will also "opined that Alzheimer's disease and dementia are progressive," but testified that the "issue with determining disability prior to December 2013 is that there was no medical evidence describing the degree of the claimant's symptoms." (*Id.* 356.) Dr. Willer also noted that while he never treated Plaintiff, it would not be possible to determine the extent of Plaintiff's symptoms during the relevant time period. (*Id.*) The ALJ noted that Dr. Willer

> [H]ad read the lay witness statements and testimony, but opined that these cannot be relied upon to determine severity, especially as the reports came much later than 2013 and he could not judge their accuracy, even if he presumed veracity. He said that anything that might have occurred before cannot be properly analyzed as there were no records from that time. Upon cross-examination, the medical expert acknowledged that Dr. Tennyson (report analyzed below) had evaluated the claimant, and he assumed she was qualified to diagnose the claimant. He said that her reliance on past lay statements was still not sufficient to establish severity of symptoms as of that remote date. He reiterated that the lay witnesses who testified or submitted statements were not medical providers capable of establishing degree of impairment or extent of any deficits that they claimant may have actually had at that time. Dr. Tennyson's evaluation was only relevant as of the date of the examination and supporting medical records. He summarized that it is possible, even likely, that the claimant had Alzheimer's prior to her date last insured, but that it was not possible based on the instant record to ascertain the extent of symptoms or whether it had reached a certain degree of severity prior to December 31, 2013 (2021

> Hearing Testimony). I have found that Dr. Willer's assessment is supported by reasoned consideration and a careful review of the record, and I accord it great weight.

(AR 356-357.)  Ultimately, the ALJ concluded that "[t]he claimant was not under a disability, as defined in the Social Security Act, at any time from June 15, 2009, the alleged onset date, through December 31, 2013, the date last insured." (*Id.* 360.)

Plaintiff filed the instant Complaint before this Court on October 6, 2021.  (ECF No. 1). Briefing concluded on May 18, 2022.  (ECF Nos. 9, 13, 14.)

## II.   <u>LEGAL STANDARD</u>

### a.  **Disability Determination**

An individual is "disabled" and therefore eligible for disability insurance benefits if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The individual's impairment must be severe to the point that the individual cannot engage in his previous work or in "any other kind of substantial gainful work which exists in the national economy," *i.e.*, work that exists in significant numbers either in the region where such individual lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A); *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner employs a five-step sequential evaluation process for disability claims. *See* 20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof for the first four steps of

the analysis, and the burden shifts to the Commissioner for the fifth step. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

First, a claimant must not have engaged in substantial gainful activity since the alleged disability onset date. 20 C.F.R. § 404.1520(a)(4)(i), (b). Second, the Commissioner considers "the medical severity of [the claimant's] impairment(s)." *Id.* § 404.1520(a)(4)(ii). The claimant must have a "medically determinable impairment" or combination of impairments severe enough to limit the claimant's ability to perform basic work activities for a continuous period of at least twelve months. *Id.*; *id.* § 404.1509. The claimant bears the burden of establishing the first two requirements, and failure to satisfy either automatically results in denial of benefits. *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If the claimant satisfies her burden at steps one and two, she proceeds to the third step. At step three, the Commissioner considers the "medical severity of [the claimant's] impairment(s)." *Id.* § 404.1520(a)(4)(iii). The impairment or impairments must meet or equal a listing in Appendix 1 of C.F.R. Part 404, Subpart P. *Id.* § 404.1520(d). The impairment or impairments are "medically equivalent to a listed impairment . . . if [they are] at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 404.1526(a). If the claimant is able to make a sufficient showing at step three, she is deemed disabled. *Id.* § 404.1520(a)(iii).

However, if the claimant fails to make a sufficient showing at the third step, the analysis proceeds to an evaluation of the claimant's RFC and past relevant work at the fourth step. *Id.* § 404.1520(a)(4)(iv). RFC is the most the claimant can do in a work setting despite her limitations. *Id.* § 404.1545(a)(1). The Commissioner "assess[es] [the claimant's] residual functional capacity based on all the relevant evidence in [her] case record," and "consider[s] all of [the claimant's] medically determinable impairments," including ones that are not "severe" pursuant to

10

§§ 4041520(c), 404.1521, and 404.1523.  *Id.* § 404.1545(a)(1)-(3).  The Commissioner assesses

RFC based on "all of the relevant medical and other evidence."  *Id.* § 404.1545(a)(3).  Past relevant

work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful

activity, and that lasted long enough for [the claimant] to learn to do it."  *Id.* § 404.1560(b)(1).

"The claimant bears the burden of demonstrating an inability to return to [her] past relevant work."

*Plummer*, 186 F.3d at 428 (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).

      If the claimant is incapable of performing her past relevant work, the analysis proceeds to

the fifth and final step.  *See id.* § 404.1520(a)(4)(iv)-(v); *Plummer*, 186 F.3d at 428.  At step five,

the claimant must be unable to adjust to other work in light of her RFC, age, education, and work

experience to be considered disabled.  *See id.* § 404.1520(a)(4)(v), (g).  Before denying a claim at

step five, the Commissioner must show that the claimant is capable of other work existing "in

significant numbers in the national economy."  *Id.* § 404.1560(c)(2); *see also Poulos*, 474 F.3d at

92.

      **b.  Standard of Review**

      District courts may "affirm[], modify[], or revers[e] the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In

reviewing the decision, the court determines whether the ALJ's findings are supported by

substantial evidence.  *See id.*; *see also Poulos*, 474 F.3d at 91.  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Reefer*

*v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401

(1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance of the evidence."  *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)

(internal quotation marks and citation omitted).

The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Thus, this limitation on a reviewing court's discretion applies "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). The Court must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

III.   **ANALYSIS**

Based on this Court's review of the ALJ's decision and the Administrative Record submitted by the Commissioner, the Court finds good cause to affirm the Commissioner's finding that Plaintiff was not under a disability from "June 15, 2009, the alleged onset date, through December 31, 2013, the date last insured." (AR 360.) Notably, in reaching a decision, an ALJ must evaluate the evidence and explain the reasons for accepting or rejecting evidence. *Cotter*, 642 F.2d at 706. Here, the Court is satisfied that the ALJ's opinion is sufficiently explained and supported by substantial evidence.

In support of her appeal, Plaintiff puts forth three principal arguments: (1) that the ALJ "did not properly or adequately evaluate the weight given to Dr. Tennyson's opinion based on the six factors of 20 C.F.R. 404.1527(C)(1)-(6)" as directed by the District Court; (2) "The ALJ did not properly or adequately evaluate the weight accorded the lay witnesses" as directed by the

District Court; and (3) that "Dr. Willer's testimony deserves very little weight." (Pl.'s Moving Br. 9-16, ECF No. 9.) The Court will address these arguments in turn.

**A.      The ALJ's Decision Sufficiently explains the Weight Given to Dr. Tennyson's Opinion.**

Plaintiff argues that the ALJ erred by failing to properly evaluate the weight given to Dr. Tennyson's medical opinion based on the six factors under 20 C.F.R. 404.1527(C)(1)-(6). (*See* Pl.'s Moving Br. 9-12.) The six factors under (1)-(6) consist of: 1) examining relationship; 2) treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) any other relevant factors. 20 C.F.R. 404.1527(C)(1)-(6). However, the "ALJ need not explicitly discuss each factor in his decision." *Samah v. Comm'r of Soc. Sec.*, No. 17-08592, 2018 U.S. Dist. LEXIS 200254, at *14 (D.N.J. Nov. 27, 2018); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) (stating "a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence.").

Typically, an ALJ accords great weight to the treating physician's report, "especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir. 1987). However, to warrant controlling weight, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(c)(2). The ALJ is not allowed to ignore probative medical advice from Plaintiff's treating physician(s). *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (ruling that the Administration's decision to deny the plaintiff benefits was not supported by substantial evidence because the ALJ ignored probative medical evidence, the ALJ relied on two non-treating physicians' testimony who did not have access to the

plaintiff's medical records, the ALJ determined that the plaintiff did not suffer from a disability because the treating doctor said the plaintiff was "stable," and the ALJ relied on the plaintiff's activities of daily living without explaining how they contradict a finding of a disability). If the treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," then the ALJ need not lend it great weight. 20 C.F.R. §§ 404.1527(c)(2); *see id.*

The Court finds that the ALJ adequately addressed the six factors under 20 C.F.R. 404.1527(C)(1)-(6), noting that the "ALJ need not explicitly discuss each factor in his decision," *Samah*, 2018 WL 6178862 at *5, but only needs to "articulate at some level her analysis of a particular line of evidence," *Phillips*, 91 F. App'x at 780.

First, the ALJ adequately addressed factors one, two, and five: examining relationship, treatment relationship, the treating source's specialization.

The ALJ highlighted that Plaintiff underwent a "neuropsychological evaluation from Dr. Karen Tennyson, Ph.D. at Kessler institute." (AR 355.) This evaluation was the result of Plaintiff wanting to work with foster children, which prompted the need for a neurological examination. (*Id.*) Dr. Tennyson "conducted a thorough examination" on October 1, 2015, at which time Dr. Tennyson diagnosed Plaintiff with dementia, and concluded that Plaintiff had "severe memory deficits with cognitive deficits." (*Id.*) Dr. Tennyson also noted that "there appeared to have been a progressive decline, but that neither the claimant nor her husband were good historians in dating the course of the symptoms." (*Id.*) Further, the ALJ noted that Dr. Justin Willer, the medical expert who presented testimony at the hearing, asserted that he "assumed [Dr. Tennyson] was qualified to diagnose the claimant," an assertion that the ALJ and the parties do not appear to challenge. (*Id.*) This Court finds that the ALJ has properly and sufficiently weighed these factors.

14

Second, the ALJ considered factors three and four: the supportability and consistency of Dr. Tennyson's opinion. As is mentioned throughout the ALJ's opinion, there is a lack of medical records until Plaintiff sought medical treatment in 2015. (*Id.* 355.) The lack of medical records also served as a point of reservation for Dr. Willer, who noted "that it is possible, even likely, that the claimant had Alzheimer's prior to her date last insured, but that it was not possible based on the instant record to ascertain the extent of symptoms or whether it had reached a certain degree of severity prior to December 31, 2013." (*Id.* 357.) Dr. Willer had access to the same record as Dr. Tennyson. This Court notes that Dr. Tennyson discussed that dementia is a progressive disease, and that is it likely true that Plaintiff began experiencing mental decline before she began seeking medical treatment. (*Id.* 355, 357.) However, this Court also notes that the lack of medical records before 2015 make it impossible to conclusively determine the level of any impairments in the relevant time period. The ALJ accurately points out that "there is no medical evidence dating back to 2013, and that it is not until 2015 that the claimant complained of memory and other symptoms of cognitive decline and, at that later time, they were initially characterized as mild." (AR 357.) Further, while Dr. Tennyson's opinion suggesting that Plaintiff was suffering from memory loss prior to June 15, 2009, is supported by the testimony provided by Plaintiff's husband, Mary T., and Amanda M., there is not sufficient medical evidence from that time period to conclusively and accurately ascertain Plaintiff's level of impairment during the relevant time frame. The ALJ credited testimony that Plaintiff was suffering from memory loss, and in his Second Opinion, assigned Dr. Tennyson's opinion "little weight" because it "does not in fact describe any specific work-related limitation applicable to the relevant period; rather, she indicates only that [Plaintiff's] cognitive dysfunction began at least prior to 12/2013, but most likely as early as 2009," and is "conclusory and does not assess function-by-function limitations." (*Id.* 357-358.)

15

(internal quotations omitted.)[1]   Ultimately, the ALJ declined to speculate as to the severity of Plaintiff's disability because there was no medical evidence in the record from this time period, a decision this Court finds is supported by substantial evidence.

Finally, the ALJ also properly accounted for factor six: any other relevant factors. As Defendant notes, the ALJ put forward several compelling reasons to justify her weight of Dr. Tennyson's opinion.  (*See* Def.'s Opp'n Br. 14-15.)   The reasons are as follows: 1) Plaintiff did not receive medical treatment until after her date last insured, (AR 345); 2) Plaintiff did not alert medical providers to her short-term memory issues until sixteen months after her date last insured, (*id.* 344); 3) Plaintiff's primary care physician, Dr. Liebross, only documented "mildly impaired short-term memory," and "oriented to time, place, person, and situation" as of 2015, (*id.* 296, 299, 308); 4) Dr. Pandya stated in May and September 2015 respectively that Plaintiff's symptoms were "mild to moderate in severity," and Plaintiff's "cognitive symptoms have not significantly affected activities of daily living," (*id.* 316, 319, 354-55.); 5) Dr. Water's stated that Plaintiff's "basic daily living activities were intact" other than managing finances, (*id.* at 355); 6) Dr. Umpierre, Dr. Foley, and Dr. Willer, three experts who independently evaluated Plaintiff, all agreed that the record did not point to Plaintiff having functional limitations prior to her date last insured, (*id* at 108, 357, 368-90, 743-56); and 7) Plaintiff continued to perform wide-ranging daily activities after her date last insured which consisted of driving, working 20 to 80 hours per week until the couple's

---

[1]  This Court notes that the ALJ also lent no weight to Dr. Tennyson's opinion that "claimant should not be solely responsible for caring for another person, should stop driving, should be given verbal instructions in a simple format in "small chunks," should use a notepad and calendar, and should be supervised for complex tasks ….These functional limitations are given no weight as to claimant's condition prior to the date last insured, though I note that such limitations would not necessarily be incompatible with unskilled work." (AR 358.)

business closed, cooking, taking care of herself, and socializing, (*id.* at 352-54, 358). As a result, the ALJ properly evaluated the six factors under 20 C.F.R. 404.1527(C)(1)-(6).

Here, unlike *Nazario*, the ALJ was not required to accord great weight to Dr. Tennyson's report. *See Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019). In *Nazario*, the Third Circuit reversed the Social Security Administration's determination that Plaintiff was not disabled because the ALJ ignored probative medical evidence, relied on the testimony of two non-treating physicians' who did not have access to Plaintiff's medical records, determined that Plaintiff did not suffer from a disability because the treating doctor said Plaintiff was "stable," and relied on Plaintiff's activities of daily living without explaining how they contradict a finding of a disability. *Id.* at 209-212. Despite Plaintiff's assertions, the instant matter does not present with the same deficiencies found in *Nazario*. First, the ALJ did not ignore probative medical evidence. *See id.* at 209-210. The ALJ considered the entire record and the record was devoid of any medical evidence from the alleged disability onset date to well past the date last insured. There was no medical evidence in the record until 2015; nearly two years after the date last insured. Second, the ALJ here did rely on the opinions of several non-treating physicians, but unlike the physicians in *Nazario*, the non-treating physicians in this case had access to Plaintiff's medical records and based their opinions on the same. Third, in *Nazario*, the ALJ found the plaintiff not to be disabled, in part because the treating doctor said Plaintiff was "stable." *Id.* at 211. Here, the ALJ did consider Dr. Liebross' medical opinion that Plaintiff's "cognitive symptoms have not significantly affected the activities of daily living." (AR 355.) However, unlike *Nazario*, the ALJ found that Plaintiff here did have an impairment, Alzheimer's Disease, but the impairment did not significantly limit Plaintiff's ability to perform basic-work related activities during the relevant time period. *See id.* at 350-351. Instead, the ALJ credited the testimony that Plaintiff suffered from a disability but

refused to conjecture as to the severity of the disability during the relevant time period without the appropriate medical documentation.  Finally, the ALJ did consider evidence about Plaintiff's daily activities, but substantial evidence supports why the ALJ found those limitations did not impact Plaintiff's work-related abilities.  For instance, prior to the date last insured, Plaintiff was driving on her own, working anywhere from twenty (20) to eighty (80) hours per week, cooking, taking care of herself, socializing, and had an interest in adoption.  *Id.* at 353-54.  Unlike *Nazario*, the ALJ did not find that Plaintiff's abilities contradicted the finding of a disability.  Instead, the ALJ determined there was not enough evidence "to support moderate or more restrictive limitations prior to December 2013" that prevented Plaintiff from performing basic work-related activities. (*Id.* at 354.)

To add, here, following the Court's directive in *Plummer*, Dr. Tennyson's opinion did not reflect "a continuing observation of the patient's condition over a prolonged period of time." 186 F.3d at 429.  As the ALJ noted, Dr. Tennyson did not evaluate Plaintiff until September 2015.  (AR 344.)  Dr. Tennyson evaluated Plaintiff for a second and final time in October 2015.  (*Id.* at 341.) Additionally, while Dr. Tennyson may have used medically acceptable clinical and laboratory diagnostic techniques, the results were only relevant from the day of the exam onward.  Without medical records or testing tracing back to 2009 highlighting Plaintiff's condition, it was acceptable for the ALJ to lend less weight to Dr. Tennyson's opinion.  Additionally, the ALJ also provided a well-reasoned list of why she discredited Dr. Tennyson's opinion.[2]  After evaluating the record as

---

[2]  The ALJ stated that:

> Upon reconsideration, and taking into consideration the review by medical expert Dr. Willer, I note that there is no medical evidence dating back to 2013, and that it is not until 2015 that the claimant complained of memory and other symptoms of cognitive decline and, at that later time, they were initially characterized as mild (see

a whole, the Court finds there is substantial evidence to support the ALJ's weighing of Dr. Tennyson's testimony.

**B.** **The Proper Weight Was Given to The Testimony of the Two Lay Witnesses.**

Next, Plaintiff argues that the ALJ erred by not properly evaluating the weight accorded to lay witnesses, Amanda M. and Mary T.  (*See* Pl.'s Moving Br. 12-14.)  An ALJ is free to reject evidence from non-medical sources, but they must provide specific reasons as to why they rejected such evidence.  *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014).  An ALJ is not permitted to "ignore uncontradicted relevant lay testimony where it corroborates the medical testimony of a treating physician and is consistent with medical records."  *Mancia v. Dir., Office of Workers' Comp. Programs, US DOL*, 130 F.3d 579, 588 (3d Cir. 1997).  To add, "lay evidence does not have to be corroborated by contemporaneous medical evidence to be credible."  *Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, 430 (3d Cir. 2003).  An ALJ must determine the credibility of a lay witness by considering the factors outlined in SSR 06-03p: 1) the nature and extent of the relationship, 2) whether the evidence is consistent with other evidence, and 3) any other factors that tend to support or refute the evidence.  (*See* Opinion, ECF No. 14, 18, Civ. No. 3:19-17386.)

---

above). I continue to accord some weight to Dr. Tennyson's overall assessment that the impairment was present prior to the date last insured and is now disabling, however, in view of the testimony of the medical expert, I find there is insufficient evidence to find that the condition was severe prior to 2013. Moreover, Dr. Tennyson's opinion, as described above, does not in fact describe any specific work-related limitation applicable to the relevant period; rather, she indicates only that "her cognitive dysfunction began at least prior to 12/2013, but most likely as early as 2009." This generalized assessment is assigned little weight, as it is conclusory and does not assess function-by-function limitations.

(AR 357-358.)

19

The ALJ gave Amanda M.'s and Mary T.'s testimony "little weight." (AR 358-59.) Under *Mancia,* the ALJ was free to give little weight to the lay testimony as the ALJ highlighted in detail that the lay testimony was not consistent with the medical record, save the opinion of Dr. Tennyson, and testimony regarding Plaintiff's daily activities. The ALJ states

> [Mary T's] opinion cites several examples of difficult learning complex tasks in a work setting, as well as an example of failure to comply with a social norm. However, relying on such anecdotes to determine how pervasive and severe her symptoms were prior to the date last insured is problematic as there is no concurrent medical reporting, and moreover, as described by this and other witnesses, claimant was engaging in quite robust functional activities during the relevant period. Thus, her reports are not consistent with the medical record; assuming claimant had some difficulty learning, accounting, auditing, and other complex business processes, there is nothing to establish that such activities were a result of her condition rather than a lack of facility with such tasks, and more importantly, even if it is assumed that her condition was a factor, there is no medical basis to assess the degree of such limitations. As noted above, even years later, there is some evidence that her function was good even after presenting to her medical providers and that her symptoms were only "mild."

(*Id.* at 359.) In regard to Amanda M.'s testimony, the ALJ states

> This opinion cites a number of memory lapses, however as noted above, relying on such anecdotes to determine how pervasive and severe her symptoms were prior to the date last insured is problematic... even years later, there is some evidence that her function was good even after presenting to her medical providers, and that her symptoms were only "mild."

(*Id.*) While lay evidence does not need to be corroborated by contemporaneous medical evidence, the ALJ points out that the lay testimony was inconsistent with medical evidence years later describing Plaintiff's condition as "mild." *See Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, 430 (3d Cir. 2003); (AR 358).

The ALJ also properly considers the three factors under SSR 06-03p. First, the ALJ describes and considers the nature and extent of Plaintiff's relationship with the lay witnesses. The

ALJ notes that Mary T. worked at the couple's business "from 2001 through 2009 as Manager of Human Resources, Acting Controller, and in IT and Facilities management." (AR 358.) The ALJ also notes Mary T.'s testimony that Plaintiff had "become increasingly involved in the operations of the Company in 2007 through 2009." (*Id.*) The ALJ considers that Amanda M. and Plaintiff have been friends since 2010, and that they know each other in both professional and personal settings. (*See id.* at 359.) Second, the ALJ satisfied the second factor under SSR 06-03p as the ALJ evaluated whether the lay testimony was consistent with other evidence. As mentioned above, the ALJ states that both Mary T.'s and Amanda M.'s testimony is inconsistent with medical records indicating that Plaintiff was functioning well and only had mild symptoms years after the date last insured. Finally, the ALJ considers factor three under SSR 06-03p citing that Plaintiff was "engaging in quite robust functional activities during the relevant period." (AR 359.) This serves as an extra reason to why the ALJ gave the lay witness testimony "little weight." Therefore, the ALJ's decision to only provide "little weight" to the testimony of Mary T. and Amanda M. is supported by substantial evidence.

### C.    The Weight Given to Dr. Willer's Opinion

Finally, Plaintiff argues that the ALJ erred by providing "great weight" to Dr. Willer's testimony. (*See* Pl.'s Moving Br. 14-15.) As Plaintiff points out, Dr. Willer admitted that his testimony diverged from his interrogatory responses. (AR 743-756.) Dr. Willer stated, "I made a mistake…it happens." (*Id.* 388.) Regardless of Dr. Willer's mistake, the Court must evaluate whether substantial evidence supports the weight that the ALJ gave to Dr. Willer's opinion. *See Hartranft v. Apfel*, 181 F.3d 358 (3d Cir. 1999). All that is required by the Court is to determine if "a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139

S. Ct. 1148, 1154 (2019).  If the answer to this question is yes, then the Court must affirm the ALJ's finding.

Here, substantial evidence supports the weight that the ALJ gave to Dr. Willer's testimony, and the weight given to Dr. Willer's testimony was one that "a reasonable mind might accept as adequate to support a conclusion."  *Hartranft*, 181 F.3d at 360; *Biestek*, 59 S. Ct. at 1154.  First, the ALJ noted that Dr. Willer made corrections to his interrogatories during his hearing testimony, and the ALJ concluded that the testimony was not "any less persuasive." (AR 356.)  Second, the ALJ carefully evaluated Dr. Miller's testimony and found that "it [was] supported by reasoned consideration and a careful review of the record."  (*Id.* 357.)  Dr. Willer evaluated both Dr. Tennyson's opinion and the lay witnesses' opinions.   Dr. Willer credited Dr. Tennyson's testimony, but only found Dr. Tennyson's conclusions to be relevant from the day of examination onward.  (*Id.* 356.)  Dr. Willer even agreed with Dr. Tennyson that it was likely that Plaintiff had Alzheimer's prior to the date last insured but found that the evidence in the entire record failed to credibly establish that Plaintiff's condition significantly impaired her work-related abilities at that specific time.  (*Id.* 356-357.)  The ALJ found this to be a reasonable conclusion.[3]  Therefore, the ALJ's weighting of Dr. Willer's opinion is supported by substantial evidence.

---

[3] The Court notes that the record indicates that two other medical experts also stated they could not infer the severity of Plaintiff's impairment prior to December 31, 2013.  Both Dr. Umpierre and Dr. Foley found that it was not possible to make inferences to Plaintiff's level of impairment prior to December 31, 2013, given the lack of medical evidence in the record.  (AR 357.)  The ALJ lent their opinions "limited weight."  (*Id.*)

I.      **CONCLUSION**

Ultimately, the Court finds that substantial evidence exists to support the ALJ's decisions surrounding the appropriate weight to lend the testimony of certain medical and lay witnesses.

The Court notes that the ALJ's Second Opinion does not contain an RFC analysis. However, it is apparent to the Court that the ALJ's Second Opinion is meant to directly address the District Court's prior instruction "direct[ing] the [ALJ] to properly explain the weight to be accorded [to] the opinion of Dr. Karen Tennyson, and to the lay testimony and/or statement of Mary [T.] and Amanda [M.]."  (AR 348.)   Since the ALJ again concluded that Plaintiff was "not under a disability … at any time from June 15, 2009, the alleged onset date, through December 31, 2013, the date last insured," the Court concludes that the RFC limitations identified in the ALJ's first Opinion is supported by substantial evidence.  (AR 17-31.)

Following, for the foregoing reasons, and for good cause shown, the Commissioner's decision to deny Plaintiff benefits shall be affirmed.  An appropriate Order follows.


Date: <u>December 30, 2022</u>                    */s/ Georgette Castner*

                                                          GEORGETTE CASTNER, U.S.D.J.